662 P.2d 1149

STATE of Idaho, Plaintiff-Respondent,

v.

William Douglas CAMPBELL, Defendant-Appellant.

No. 13318.

Court of Appeals of Idaho.

April 26, 1983.

Eric T. Nordlof, Coeur d'Alene, for defendant-appellant.

David H. Leroy, Atty. Gen., Lynn E. Thomas, Sol. Gen., Myrna A.I. Stahman, Deputy Atty. Gen., Boise, for plaintiff-respondent.

WALTERS, Chief Judge.

William Campbell was convicted of the robbery of a Coeur d'Alene, Idaho, convenience store. He appeals, seeking review of several decisions made by the trial court in the proceedings leading up to, and including, the jury trial where he was found guilty. We affirm the conviction.

The issues raised on appeal are: (1) Was Campbell denied his right to a speedy trial? (2) Should evidence, seized following a warrantless arrest, have been suppressed at trial? (3) Did the trial court err by admitting two pairs of shoes in evidence at trial, in the absence of proof of a complete "chain of custody"? (4) Was the testimony of a police officer, concerning Campbell's traffic record, sufficiently prejudicial to require a new trial? (5) Is Campbell entitled to a new trial because of improper references to facts not in evidence, made by the prosecuting attorney in closing argument? (6) Was

there sufficient evidence admitted at trial to uphold the conviction? (7) Did the admission of the shoes in evidence, the testimony about traffic violations, and the prosecutor's remarks in summation, *cumulatively* represent reversible error? The facts and procedural context of each issue will be more fully addressed in the respective parts of this opinion.

## I. SPEEDY TRIAL

Campbell contends the trial court erred by refusing to dismiss the Information against him, under I.C. § 19–3501. At the time Campbell was tried, I.C. § 19–3501 provided in pertinent part:

> The court, unless good cause to the contrary is shown, must order the prosecution or indictment to be dismissed ... [i]f a defendant, whose trial has not been postponed upon his application, is not brought to trial at the next term of the court in which the indictment is triable, after it is found.[1]

The Information, charging Campbell with robbery, was filed on December 9, 1977, and trial was held on November 27, 1978. Campbell filed his motion to dismiss on November 1, 1978, contending that, by local rule of the district court, two terms of court were held each year—one in the spring and one in the fall—and that his right to speedy trial under the statute was violated because his trial did not occur during the spring, 1978, term. The trial judge denied the motion to dismiss, holding—in essence—that "good cause to the contrary" had been shown because Campbell had acquiesced in delay occasioned by pretrial motions filed by a co-defendant.

While this appeal was pending, our Supreme Court issued two opinions which affect the application of I.C. § 19–3501, as it

appeared during the time of Campbell's prosecution. In *State v. Carter,* 103 Idaho 917, 655 P.2d 434 (1981), and in *State v. Talmage,* 104 Idaho 249, 658 P.2d 920 (1983), the Court explained that, in 1975, I.C. § 1–706—which had provided for "terms of court"—was repealed by the Legislature in response to the promulgation of I.R.C.P. 77(a). The Court held that, in cases filed after the effective date of the repeal of I.C. § 1–706, the right to speedy trial could not be determined by reference to terms of court. Instead, the court ruled that a fourfold balancing test, enunciated by the United States Supreme Court in *Barker v. Wingo,* 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), is to be applied. The factors to be considered under the *Barker* test are: (1) the length of the delay; (2) the reason(s) for delay; (3) the defendant's assertion of his right; and (4) prejudice to the defendant occasioned by the delay.

In both *Carter* and *Talmage,* our Supreme Court then proceeded to apply the *Barker* balancing test in determining those appeals. Likewise, we will review Campbell's contention concerning speedy trial under the *Barker* approach, rather than under the "term of court" concept.

### A. *Length of Delay*

The interval between the filing of the complaint against Campbell and the date of trial was approximately twelve months. A delay of this length is sufficient to trigger an inquiry into whether speedy trial has been denied. *State v. Talmage, supra,* 104 Idaho at 252, 658 P.2d at 923. However, when compared to delays which have been alleged to have constituted denial of speedy trial in other actions decided by our Supreme Court, we conclude that the twelve-month period here is not in itself so excessive as to outweigh the other balanc-

---

1. It has been held that the provision concerning indictments is equally applicable to prosecutions based upon an information. *See* I.C. § 19–1304; *State v. Hobson,* 99 Idaho 200, 579 P.2d 697 (1978). We note also that I.C. § 19–3501 was amended in 1980 by deleting

the reference to "the next term of the court in which the indictment is triable, after it is found" and inserting instead, the words "within six (6) months from the date that the indictment or information is filed with the court." 1980 Idaho Sess.Laws ch. 102, p. 226 § 1.

ing factors. *See e.g., State v. Lindsay,* 96 Idaho 474, 531 P.2d 236 (1975) (fourteen month interval between date of filing of complaint and date of trial held not to constitute denial of speedy trial, when balanced against the other factors in the *Barker* test).

### B. Reasons for the Delay

Turning to the next balancing factor, the record discloses that both Campbell and a co-defendant named Sadriana were charged with robbery, by separate Informations filed on December 9, 1977. Each defendant was scheduled to appear before District Judge Watt E. Prather for arraignment on December 15, 1977. On that date, the co-defendant Sadriana appeared, entered a plea of not guilty, and his case was scheduled for a two-day trial commencing on February 23, 1978, before District Judge James Towles. At Sadriana's arraignment, the state indicated its desire that the case be consolidated with Campbell's for trial. Campbell did not appear for the scheduled arraignment on December 15, but instead filed a motion to disqualify Judge Prather from presiding over his case. About the same time, Sadriana also filed for disqualification of Judge Towles. Both cases were then assigned to District Judge Dar Cogswell, who rescheduled the trial to commence April 27, even though Campbell had not yet been arraigned.

On January 26, 1978, Campbell appeared before Judge Cogswell for arraignment. A plea of not guilty was entered. There was no objection to consolidation of the two cases; a formal order of consolidation was entered, and the time alloted for trial was increased from two days to four days.

On March 17, co-defendant Sadriana filed a motion to dismiss his Information and noticed the motion for hearing on March 24. On March 20, however, upon discovering that no prosecutor would be available to

argue the motion on the scheduled date, counsel for Sadriana prepared an order vacating the March 24 hearing. The order also rescheduled all pretrial motions to April 27, and vacated the April 27 trial date, leaving the trial date "to be rescheduled after the hearing on the motions in the above entitled action." This order was signed by Judge Cogswell on March 20. Believing that he also had a motion pending—a motion to suppress evidence—counsel for Campbell[2] prepared an order identical to the one furnished by Sadriana's attorney and submitted it to Judge Cogswell, who signed that order on March 28.

Counsel for Sadriana then filed on April 20, motions to sever the trials and to suppress evidence, and noticed these motions for hearing on April 27. On April 27, because Judge Cogswell was unavoidably detained in a trial in another county, the hearing was vacated and rescheduled for May 16.

On May 16 counsel appeared before the court. Following argument, Sadriana's motions were taken under advisement pending further briefing and to afford Judge Cogswell time to read the transcript of the preliminary hearing. Also, it was discovered that counsel for Campbell had not, in fact, filed his motion to suppress. That motion was then filed the next day, to be considered by the court at the expiration of the briefing schedule. Following completion of the briefing schedule, Sadriana's counsel filed notice of request for a speedy trial.

On September 29, Judge Cogswell entered a written order denying all motions under advisement, including Campbell's motion to suppress. By separate order dated the same day, Judge Cogswell rescheduled the cases for trial commencing in late January, 1979. In that order, after reciting that he was mindful of the "defendants' previous request for a speedy trial," the judge specified several reasons why an earlier tri-

---

**2.** Campbell is represented on this appeal by counsel other than the one who represented

him at trial.

al date was not available, *viz.,* the defendants were not in custody, the matter had been delayed because of the pretrial motions; Judge Cogswell was the only district judge remaining in the First Judicial District, who had not been disqualified and who could preside over the trial; there were other criminal cases of greater or equal priority already scheduled before Judge Cogswell; the January, 1979, date was the first available time for a five-day trial; and that there was "good cause" for the delay in establishing the trial dates.

However, on October 16, 1978, the Supreme Court of Idaho expedited the trial by entering an administrative order appointing District Judge Roy E. Mosman, of the Second Judicial District, to preside at the trial of Campbell and Sadriana. The trial was rescheduled, to commence on November 27, 1978; and it actually was held at that time.

█ While it appears from this record that some of the delay might be attributable to the state—such as the unavailability of a prosecutor for the motion hearing on March 24 and of Judge Cogswell for the rescheduled hearing on April 27—both of those occasions were precipitated by the filing of a pretrial motion by the co-defendant Sadriana. Otherwise there is no indication in the record that any delays were caused by the state; rather the passage of time resulted from the active pursuit of the pretrial motions by both defendants who were being jointly held for trial. Under the circumstances of this case, the pursuit of these motions was not inconsistent with normal procedures to be expected in the defense of the case. Delays which are appropriate under normal procedure are permissible. *Balla v. State,* 97 Idaho 378, 544 P.2d 1148 (1976), *citing State v. Wilbanks,* 95 Idaho 346, 509 P.2d 331 (1973) *and Olson v. State,* 92 Idaho 873, 452 P.2d 764 (1969).

Campbell argues that his right to a speedy trial should not have been impaired by any delay resulting from consideration of the motions filed by his co-defendant Sadriana. We are not persuaded by this argument.

█ All of Sadriana's motions were filed before Campbell filed his motion to suppress evidence. Pretrial disposition of Campbell's motion was therefore not delayed or hindered simply because of Sadriana's filings. Campbell voiced no objection or resistance to the simultaneous consideration of his motion with those filed by Sadriana. All motions were decided in the same proceeding. In our view, had that situation not been agreeable to Campbell, he should have taken some affirmative steps to alter the procedure. It is clear that where delays in bringing a defendant to trial are caused or consented to by the defendant, he is considered to have waived the right to be tried within the time fixed by statute or required by constitution. *State v. Talmage, supra,* 104 Idaho at 253, 658 P.2d at 924. Campbell's acquiescence in the procedure followed here, as found by the trial court, reasonably could be interpreted as a consensual waiver of his right to speedy trial.

Under statutes which—like I.C. § 19–3501—protect the right of speedy trial, courts of other states have held that delays caused by a defendant's own motion to suppress, or by motions of a co-defendant where there is no objection to delay interposed by the defendant who subsequently claims a denial of the right to speedy trial, do not violate the statutory right to a speedy trial. *See Garner v. State,* 145 A.2d 68 (Del.1958); *People v. Donalson,* 64 Ill.2d 536, 1 Ill.Dec. 494, 356 N.E.2d 776 (Ill.1976); *People v. Kemp,* 49 Ill.App.3d 270, 7 Ill.Dec. 653, 364 N.E.2d 944 (Ill.Ct.App.1977); and *State v. Fogle,* 25 Wis.2d 257, 130 N.W.2d 871 (Wisc.1964). We conclude that the reasons for the delay in this case weigh more heavily against the defendant Campbell and are more properly attributable to him, than to the state.

*C. Assertion of defendant's right to speedy trial*

On October 25, 1978, after appointment of Judge Mosman to preside at trial, a

notice was filed setting the trial for November 27. On November 1, Campbell filed his motion to dismiss for lack of speedy trial. Once he disclosed his concern and desire for a speedy trial by that motion, he was tried within approximately a month. He did not make any earlier or insistent demand for trial. *See State v. Lindsay; compare Richerson v. State,* 91 Idaho 555, 428 P.2d 61 (1967); *Jacobson v. Winter,* 91 Idaho 11, 415 P.2d 297 (1966). We hold that this factor also weighs against, rather than in favor of, Campbell's claim of denial of speedy trial.

### D. Prejudice

■ "[P]rejudice is a central factor in analyzing the right to speedy trial." *State v. Holtslander,* 102 Idaho 306, 313, 629 P.2d 702, 709 (1981). Where a defendant fails to make a showing of reasonable possibility of prejudice, this factor should be given very little weight, if any, for the defendant. *Id.* Here, there is no contention that Campbell's ability to present his defense was impeded by the delay. He has not alleged or shown that he was prejudiced by the delay in any way. We can ascribe no weight to the factor of prejudice in this case.

■ In conclusion, under the applicable balancing test enunciated in *Barker v. Wingo, supra,* we hold that Campbell was not denied his right to speedy trial. While the reasoning of the trial judge, in denying Campbell's motion to dismiss, was directed to the "term of court" issue—rather than to application of the *Barker* balancing test— the result reached by the trial judge was correct and will be upheld on appeal. *See e.g. State v. White,* 102 Idaho 924, 644 P.2d 318 (1982); *Idaho Falls Consol. Hospitals, Inc. v. Bingham County Bd. of County Com'rs,* 102 Idaho 838, 642 P.2d 553 (1982). The order denying the motion to dismiss is affirmed.

### II. WARRANTLESS ARREST AND SEIZURE OF EVIDENCE

Campbell next contends that his arrest and the ensuing seizure of evidence in his house were illegal because there were no warrants either for the arrest or for a search. Upon that basis, prior to trial, he moved for suppression of evidence seized at the time of his arrest. The motion was denied by the district court. The court ruled that "[t]he officers had valid reason for entering the house in hot pursuit of suspected felons and in the course of such pursuit were entitled to seize any items of incriminating evidence that were within their plain view." *See State v. Harwood,* 94 Idaho 615, 495 P.2d 160 (1972) (recognizing hot pursuit exception to search warrant requirement); *State v. Ellis,* 99 Idaho 606, 586 P.2d 1050 (1978) (recognizing lawfulness of seizure of evidence in plain view).

■ Preliminarily, we note that the existence of exigent circumstances, excusing the lack of a warrant, must be determined from the totality of the circumstances. The question of exigency is addressed to the factfinding function of the trial court, and its findings in that regard will not be set aside unless determined to be clearly erroneous. *United States v. Jones,* 635 F.2d 1357, 1360 (8th Cir.1980); *United States v. Flickinger,* 573 F.2d 1349, 1357 (9th Cir.1978), *cert. denied,* 439 U.S. 836, 99 S.Ct. 119, 58 L.Ed.2d 132 (1978); *United States v. Bradshaw,* 515 F.2d 360, 365 (D.C. Cir.1975), *cert. denied,* 424 U.S. 956, 96 S.Ct. 1432, 47 L.Ed.2d 362 (1976); *United States v. Rosselli,* 506 F.2d 627 (7th Cir.1974); *State v. Lloyd,* 61 Haw. 505, 606 P.2d 913 (Hawaii 1980). According to the standard announced by the United States Supreme Court, a finding is not clearly erroneous unless, after reviewing the entire evidence, the court on appeal is left with the definite and firm conviction that a mistake has been committed. *United States v. Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 541, 92 L.Ed. 746 (1948). *See also United States v. Jones, supra.*

We will preface our discussion of the arrest and seizure of evidence by reviewing the evidence as presented at the preliminary hearing in this case. On November 23,

1977, at 2:20 a.m., an armed robbery occurred at the Circle K Store located at Twentieth and Sherman Streets in Coeur d'Alene, Idaho. While the store clerk and an off-duty policeman, Donald Brown, were in the store, three persons, armed with a shotgun and with a pistol, entered and demanded the store's money. The intruders wore hats or knit caps on their heads and scarves or handkerchiefs covering portions of their faces. The store clerk gave money to the robbers and they immediately left the store. After waiting a moment, Officer Brown exited the store and observed four persons running up Twentieth Street. Officer Brown initially attempted to follow the suspects by car, but soon determined it would be best if he returned to the store and notified the authorities. Fresh snow had fallen that evening. Officer Brown then undertook to follow the suspects' footprints from the store. Two sets of tracks led to a parked vehicle. The occupants of that vehicle were later apprehended by the police. The other two sets of tracks were followed by Brown for nearly forty minutes and led to a residence located at Seventh and Hastings. These two sets of footprints were distinctive in appearance in that one set of tracks had a "waffle-type" tread and the other had a "ripple-type" tread.

While Brown was following the footprints in the snow, two other officers, Halligan and Merrick, stayed in close proximity to him, in their vehicle. They arrived at the residence at approximately 3:00 a.m., and then proceeded to circle the block for about five minutes. When they returned, Officer Halligan walked to within ten feet of the house on two occasions and looked through a window for approximately two to five minutes. Gazing through an area approximately one foot wide between the curtains on the window, he observed three persons sitting around a table, handling money. Following Officer Halligan's second effort to look into the house, Officer

Merrick ordered the occupants of the house to come out. Campbell and Sadriana walked out of the house and were arrested. Campbell was identified by Officer Brown as a participant in the robbery. Campbell does not now dispute that probable cause existed for his arrest.

After arresting Campbell and Sadriana, the police entered the residence to look for other subjects. The police passed through the living room and kitchen on their way to the basement, where they arrested a Mr. Shepard and a Mr. Williams. At that time, the police confiscated from the basement a 12-gauge shotgun, two pairs of pants which were wet below the knees, and two pairs of wet shoes. One pair of shoes had a waffle tread on the sole; the other pair had a ripple tread. They also confiscated two coats found in the kitchen—one of which contained money in a pocket—and a roll of dimes, a hat similar to one worn during the robbery, and a pair of wet boots that were found in the living room closet. As noted earlier, upon these facts the district court found that the seizure of this evidence was permissible.

### A. Campbell's Arrest

Campbell contends that his arrest was invalid because it was made without a warrant. He cites *Payton v. New York,* 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980), decided after his conviction, to support the contention that his arrest was unlawful and that any evidence seized as a result of the arrest should have been suppressed.[3] In *Payton,* the United States Supreme Court held that, absent exigent circumstances, a warrantless and nonconsensual entry by police officers into the arrestee's home to effect a "routine" felony arrest is unreasonable under the Fourth Amendment, and that evidence seized as a result of the entry cannot be used against the arrestee at trial.

In our view, *Payton* is inapposite to Campbell's case. While the police here did

---

**3.** *Payton* was held applicable retroactively, to cases pending on direct appeal when it was

decided, in *United States v. Johnson,* 457 U.S. 537, 102 S.Ct. 2579, 73 L.Ed.2d 202 (1982).

not have an arrest warrant, neither were they attempting to make a "routine" arrest. As found by the district court below, the police were acting under the exigent circumstances recognized in *Payton,* in arresting Campbell. 445 U.S. at 590, 100 S.Ct. at 1382.

The case of *Warden, Maryland Penitentiary v. Hayden,* 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967), involved circumstances almost identical to the instant matter. There the police, being aware that an armed robbery had just occurred and having probable cause to believe that the robber had entered a house a few minutes before their arrival, entered, searched the house and arrested the suspect. Approving the warrantless entry to arrest the robber and to search for weapons, the United States Supreme Court, speaking through Mr. Justice Brennan, stated:

> We agree with the Court of Appeals that neither the entry without warrant to search for the robber, nor the search for him without warrant was invalid. Under the circumstances of this case, "the exigencies of the situation made that course imperative." [Citations omitted.] The police were informed that an armed robbery had taken place, and that the suspect had entered 2111 Cocoa Lane less than five minutes before they reached it. They acted reasonably when they entered the house and began to search for a man of the description they had been given and for weapons which he had used in the robbery or might use against them. The Fourth Amendment does not require police officers to delay in the course of an investigation if to do so would gravely endanger their lives or the lives of others. Speed here was essential, and only a thorough search of the house for persons and weapons could have insured that Hayden was the only man present and that the police had control of all weapons which could be used against them or to effect an escape.

387 U.S. at 298–99, 87 S.Ct. at 1645–46.

The Idaho Supreme Court has enunciated a number of the factors to be considered in determining whether exigent circumstances exist. *See State v. Rauch,* 99 Idaho 586, 590, 586 P.2d 671, 675 (1978). Generally,

> [t]he term "exigent circumstances" refers to a catalogue of exceptional or compelling circumstances which in various situations allow police to enter, search, seize and arrest without complying with the warrant requirements of the United States Constitution.... In the context of warrantless entries and arrests, courts consider six factors to determine if "exigent circumstances" are present: (1) the gravity or violent nature of the offense with which the suspect is to be charged; (2) whether the suspect is reasonably believed to be armed; (3) a clear showing of probable cause; (4) a strong reason to believe the suspect is in the premises to be entered; (5) the likelihood that the suspect will escape if not swiftly apprehended; (6) the peaceful circumstances of the entry.

*Id.* 99 Idaho 590–91, 586 P.2d 675–76.

In this case, the police had reason to believe there were weapons and armed robbery suspects in the house. Prompt action was necessary to effect an arrest while minimizing the chances for violence or escape. In view of the exigent circumstances, the police had a right to enter the house without a warrant. This right logically would include the less intrusive action of ordering the suspects to leave the house and arresting them outside. We conclude that under both *Warden* and *Payton,* the arrest of Campbell without a warrant was proper.

### B. Seizure of Evidence

We next address the activities of the officers when they entered the residence following Campbell's arrest. The police officers were aware that at least three, if not four, people had participated in the robbery. By looking into the house, the police had learned that there were more people inside than just Campbell and Sadriana, who exited the home. When they were arrested, neither Campbell nor Sadriana had any

firearms on their persons. The police reasonably could have inferred that firearms remained in the house with at least one other occupant. In our view, under these circumstances, the police had a reasonable basis to believe that the other apparent occupant of the house was connected with the robbery.

■ The police were faced with two choices. They could have remained outside—knowing that another person, who was possibly armed, remained in the house—while the officers took steps to obtain arrest and search warrants. Or the officers could have entered the house to apprehend the other person or persons in the home and take control of any weapons, as a protective measure. Under these circumstances we cannot say that the district court erred in finding that the officers acted reasonably. *United States v. Jones,* 635 F.2d 1357, 1360 (8th Cir.1980). The officers were justified, by the exigencies of the circumstances and with probable cause, in entering the residence to search for other suspects who likely possessed weapons, instrumentalities, and evidence of the robbery, in order to diminish the potential for danger, escape of a suspect, and destruction of evidence. *Accord: People v. Escudero,* 23 Cal.3d 800, 153 Cal.Rptr. 825, 592 P.2d 312 (Cal.1979); *Faulkner v. State,* 646 P.2d 1304 (Okl.Cr.App.1982); *State v. Hendricks,* 25 Wash.App. 775, 610 P.2d 940 (Wash.App. 1980).

All of the items of physical evidence used against Campbell at his trial were found by the police in plain view, once they entered the residence. Our Supreme Court has held that "[w]here incriminating evidence is exposed to the plain view of investigating officers who have not only a right, but also a *duty* to be where they are, and in a position from which it is observed, it is susceptible of lawful seizure." [Emphasis in original.] *State v. Ellis,* 99 Idaho 606, 608, 586 P.2d 1050, 1052 (1978).

Campbell also argues that even if the warrantless entry and "search" of his resi-dence was incident to a valid arrest, the scope of the search went beyond the permissible limits allowed by *Chimel v. California,* 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). There it was held that limited warrantless searches incident to arrest,—of the person being arrested and to the area "within his immediate control"—are permissible. Under *Chimel* it is reasonable to remove any weapons that the arrestee may seek to use in order to resist arrest or to effect an escape, and to search for and seize any evidence on the arrestee's person or in the area immediately within his control, to prevent concealment or destruction of the evidence.

■ *Chimel* does not apply to the case before us. In the constitutional sense, no "search" incident to an arrest occurred. The arrest of Campbell was made outside the house. The police then entered the house to look for weapons and other persons suspected of participating in a very recent robbery. They entered the home under circumstances approved in *Warden.* The evidence seized from Campbell's house and offered at his trial was in plain view. Under those circumstances, *Chimel* is inapposite. *See State v. Tisdel,* 94 Idaho 329, 487 P.2d 692 (1971). We hold that the district court did not err in denying Campbell's motion to suppress.

## III. ADMISSION OF THE SHOES IN EVIDENCE

Two pairs of footwear, seized by the police from Campbell's residence, were offered in evidence at the joint trial of Campbell and Sadriana. These were the shoes with the "waffle" and "ripple" sole treads which were found by the police in the basement of the Campbell house. Foundation for admission of these items was made through the testimony of one of the police officers. The officer identified the shoes as being the same ones found in the residence. Campbell objected to the admission of these exhibits on several grounds. The trial court

overruled Campbell's objections and admitted the shoes in evidence. On this appeal we are asked to review only the ground of "chain of custody" in respect to the admission of that evidence.

Campbell argues that the shoes were improperly admitted because no proof was offered by the state that the shoes were "substantially in the same condition," at the time of trial, as they were in when seized by the arresting officers. Campbell cites *State v. Crook,* 98 Idaho 383, 565 P.2d 576 (1977), to support his contention. In *Crook* our Supreme Court said:

> As a general rule in criminal proceedings, an exhibit must be shown to be in substantially the same condition when offered into evidence as it was when the crime was committed. However, the party offering the exhibit need not exclude all possibility of tampering. Where the court is satisfied that in all reasonable probability the article has not been changed in any material respect, the article is admissible into evidence.... Ordinarily, the party offering an exhibit establishes its chain of custody in order to create a presumption that it was not materially altered. If the chain of custody has been broken, however, the party can still rely upon other evidence to show a lack of material alteration.

98 Idaho at 384, 565 P.2d at 577.

■■■■ The standard for the admissibility of evidence is whether the trial court can determine that, in all reasonable probability, the proffered exhibit has not been changed in any material respect. *State v. Griffith,* 94 Idaho 76, 481 P.2d 34 (1971). Proof through a chain of custody is a means by which identity of an exhibit may be established and by which the standard of admissibility can be satisfied. However, it is not, of itself, a separate requisite for admissibility.

■■■■ Here both pairs of shoes were positively identified as being the same ones taken from the Campbell residence. The officer testified in substance that both pairs were in the same condition at trial as they were when they were seized, except they were no longer wet and one of the shoes had a small gap or tear on it that he did not recollect seeing before. The trial court determined that both pairs would be admitted, notwithstanding Campbell's objection on the grounds of lack of chain of custody. Campbell did not assert that the exhibits had been materially altered in any respect. We believe the trial court was justified, under *Crook,* in concluding that the items had not been materially altered, and should be admitted without the chain of custody proof.

We note that, after the shoes were admitted in evidence, the jury requested the use of a magnifying glass to inspect the soles of one of the pairs of shoes. The jury indicated to the court and counsel that a question had arisen as to whether Campbell's initials appeared on the soles of one pair of footwear. Before granting the jury's request, the court and counsel examined the shoes with a magnifying glass. All of them concluded that no such markings appeared. While Campbell now suggests that this "episode" underscores his "chain of custody" argument, we disagree. This incident did not, in our view, create a genuine issue that the shoes had been altered. We hold that the trial court did not abuse its discretion in admitting the shoes in evidence, as exhibits.

## IV. TESTIMONY CONCERNING TRAFFIC VIOLATIONS

Campbell contends that the trial court should have ordered a mistrial on its own motion because of prejudicial testimony given by Officer Halligan, concerning Campbell's traffic record. Halligan was the officer who, from outside Campbell's residence, observed three people sitting at the kitchen table handling money. As he was testifying about that occurrence, he mentioned that he had recognized two of the individuals from "professional contacts." At that point, the prosecutor asked that the

jury be excused. After the jury left, the prosecutor disclosed that he next intended to ask Officer Halligan under what circumstances and for how long he had known one of the defendants. The prosecutor expressed his desire not to invite a mistrial. In response, the court said:

> THE COURT: Well, does your question have to disclose anything about the [sic] prior criminal action? Why can't you just ask him if he's seen one of these people before and if he answers yes ask him which one and for how long a period of time or something bland of that nature.
>
> [BY THE PROSECUTOR]: O.K. If that would suffice that would be fine.

The jury was then returned to the courtroom and the following transpired:

> Q. Now, Sergeant Halligan, you indicated that you'd seen one of those individuals before?
>
> A. Yes, sir, I did.
>
> Q. And which individual was that?
>
> A. Mr. Campbell.
>
> Q. O.K. And how long did you have an opportunity to see him before?
>
> A. Prior to this situation, sir?
>
> Q. Prior to this situation.
>
> A. I contacted Mr. Campbell on several times.
>
> Q. And can you recall the time frame as far as you're contacting him, how long you had an opportunity to observe him and talk to him?
>
> A. Yes, sir. It was on a—I would say traffic violations—
>
> [BY CAMPBELL'S ATTORNEY]: Going to object, your Honor. Ask the jury be excused.
>
> THE COURT: All right. If you will step out again, ladies and gentlemen.
>
> (The jury panel was excused from the courtroom.)
>
> THE COURT: Officer Halligan, it's unbelievable to me that you could sit here through the discussion that we had out of the presence of the jury and then volunteer that information.
>
> THE WITNESS: Well, apparently I misunderstood, sir.
>
> THE COURT: Apparently you did. Now, you have been asked how long you had an opportunity to observe this man. I don't think that's a very hard question to understand, it can be answered in terms of seconds and minutes and hours.
>
> THE WITNESS: Yes, sir.
>
> THE COURT: You don't have to say that there was any arrest involved in it or any investigation involved in it or anything of the nature.
>
> Now, I'll tell you again, if that happens you're probably going to be in contempt of court.
>
> THE WITNESS: Yes, sir.
>
> THE COURT: You have anything you want to say on this record at this time, [counsel for defendant Campbell]?
>
> [BY CAMPBELL'S ATTORNEY]: I think the Court's already said it, your Honor, adequately.
>
> THE COURT: All right. Now, Mr. [Prosecutor], if you want to spend some time with your witness and make sure that he understands exactly what's going on I do not want anything to come in at this stage that might be construed as prejudicial and I'm shocked at that conduct by this officer after we—in his presence discussed that very subject. If you have any worry at all about him being able to understand you why you better go through your questions with him so there's no questions about this again.
>
> [BY THE PROSECUTOR]: O.K. Your Honor, may I have just a few minutes with the officer?
>
> THE COURT: Yes, we'll be in recess.

> \*  \*  \*  \*  \*  \*

> THE COURT: All right. The record should show that the jury has returned. Proceed with your examination, please.
>
> [BY THE PROSECUTOR:] Thank you, your Honor.

Q. Sergeant Halligan, you stated that you'd seen Defendant Campbell before. How many times have you seen him before?

A. Three to four occasions, sir.

Q. O.K. And do you recall how long you had contact with him on each of those occasions?

A. Three of the occasions approximately five to ten minutes. Fourth occasion 15, 20 minutes.

[PROSECUTOR]: O.K. I have no further questions, your Honor, at this time.

Campbell cites *State v. Wrenn,* 99 Idaho 506, 584 P.2d 1231 (1978) for the proposition that evidence of other unrelated criminal activity of the accused is generally inadmissible. There the defendant Wrenn was charged with robbery. On appeal, Wrenn contended the trial court erred in denying a motion for mistrial following the testimony of an officer who had stated that Wrenn was traveling in a stolen automobile when the robbery was committed. On review, our Supreme Court held that this testimony was prejudicial, which prejudice could not be remedied by a cautionary instruction to the jury. The court said:

> The prejudicial effect of such testimony is that it induces the jury to believe the accused is more likely to have committed the crime on trial because he is a man of criminal character. It, therefore, takes the jury away from their primary consideration of their [sic] guilt or innocence of the particular crime on trial.

99 Idaho 510, 584 P.2d at 1235. The Court concluded that, when coupled with an erroneous instruction on "flight" and in light of the lack of strong evidence of participation in the robbery, the prejudice to Wrenn was sufficient to warrant a new trial.

Here, Campbell did not move for a mistrial, did not move to strike the reference to traffic violations, did not request a cautionary instruction, and did not assert or argue the admission of the testimony as a basis for new trial; nor did he object to the procedure followed by the court when allowing Officer Halligan to testify. We have held that generally, in the absence of a timely objection at trial, the alleged error will not be considered on appeal, unless it is so fundamental or plain as to constitute a deprivation of due process. *State v. Wells,* 103 Idaho 137, 139, 645 P.2d 371, 373 (Ct. App.1982). *See also State v. Garcia,* 100 Idaho 108, 594 P.2d 146 (1979).

It does not appear that introduction of evidence of a prior felony is fundamental error, which will be reviewed in the absence of a timely objection to the admission of that evidence. *See State v. Knee,* 101 Idaho 484, 616 P.2d 263 (1980). This rule would apply with even greater strength to testimony concerning prior "traffic violations" in a prosecution for a non-traffic offense, where the defendant's traffic record has no bearing on the case.

■ We are unpersuaded that Halligan's reference to Campbell's traffic record would have induced the jury to believe that Campbell was more likely to have committed the robbery. *State v. Wrenn, supra.* We conclude under these circumstances, that "fundamental" error did not occur and that the trial court was not required, *sua sponte,* to order a mistrial.

## V. PROSECUTOR'S SUMMATION

Campbell next contends that the prosecuting attorney, in summation to the jury, made two references to facts not in evidence, which should have required a declaration of a mistrial. First, in the course of discussing the identification of Campbell by one of the officers, the prosecutor made reference to a Mr. Williams, stating that Williams was at Campbell's preliminary hearing, and that he, Williams, looked "almost exactly like" Campbell, according to Campbell's testimony. At that point defense counsel objected on the grounds that there was no evidence that Williams was at the preliminary hearing. The objection was sustained. Second, discussing the testimo-

ny of Officer Halligan, who had observed three people sitting at the kitchen table in Campbell's house, the prosecutor rhetorically speculated as to what those persons were doing. The prosecutor stated: "There's no cards, there's no poker chips—." At that point defense counsel again objected. The objection was sustained on the basis of an absence of testimony concerning poker chips.

Recently in *State v. LaMere,* 103 Idaho 839, 655 P.2d 46 (1982), the Idaho Supreme Court discussed appellate review of comments made by a prosecutor in closing argument. In *LaMere,* unlike the record here, defense counsel failed to object to alleged prejudicial comments. The Court applied the rule announced in *State v. Sharp,* 101 Idaho 498, 503, 616 P.2d 1034, 1039 (1980), that on appeal, even without objection,

> we will consider an alleged error, 'where the record shows that the prosecuting attorney has been guilty of misconduct calculated to inflame the minds of jurors and arouse prejudice or passion against the accused by statements in his argument of facts not proved by evidence. . . .'

The Court then considered two allegedly prejudicial statements made by the prosecutor. As to the first one, the Court held that "[w]e do not believe that the comment was so inherently prejudicial that an objection, accompanied by an instruction by the [trial] court to disregard the comment, would not have cured the defect." 103 Idaho at 844, 655 P.2d at 51. As to the second allegedly prejudicial comment, the Court applied a standard based on *State v. LaPage,* 102 Idaho 387, 630 P.2d 674 (1981), and held that "[e]ven if the prosecutor's statement had been properly excluded from the trial, we are convinced beyond a reasonable doubt that the jury would still have arrived at the same verdict. Therefore, we hold it amounted to harmless error." 103 Idaho at 845, 655 P.2d at 52.

▮ We believe that the statements made by the prosecutor in this case fall within the *Sharp* rule applied by our Su-

preme Court to the first prosecutorial remark examined in *LaMere.* Here, the comments of the prosecutor were not so inherently prejudicial that an objection, and accompanying instruction, would not have cured the defect. Although objections were, in fact, made and sustained, no immediate request was made at that time for a specific instruction to the jury to disregard either of the prosecutor's remarks. Moreover, the jury had been generally instructed—before opening arguments and again at the close of the evidence, but before counsels' summations—that statements and remarks of counsel were not evidence and that any such statements or remarks which did not conform to the evidence were to be disregarded. We hold, under these circumstances, that no reversible error occurred.

## VI.  SUFFICIENCY OF THE EVIDENCE TO SUPPORT CONVICTION

Campbell next contends that the evidence in this case was insufficient to support a conviction. He points to inconsistencies in the testimony; he questions the identification made by Officer Brown; he urges that the police could have made a more thorough investigation by way of taking fingerprints and making footprint comparisons; he argues that other evidence of the robbery could have been, but was not, produced; and he suggests that inferences other than guilt could be drawn from the evidence.

▮ By and large, these contentions concern matters which could be argued to the jury, and which fall within the province of the jury—to be considered along with the evidence submitted—in determining whether the state had proven guilt beyond a reasonable doubt. We are guided by the principle that where a jury verdict is supported by substantial, competent evidence, it will not be disturbed on appeal. *State v. Olin,* 103 Idaho 391, 648 P.2d 203 (1982). We are required to review the record to determine if such evidence exists, and we

are precluded from substituting our judgment for that of the jury as to the credibility of witnesses, the weight of the testimony, and the reasonable inferences to be drawn from the evidence. *State v. Warden,* 100 Idaho 21, 592 P.2d 836 (1979). Having reviewed the record fully, we hold the evidence does sustain the verdict.

## VII. CUMULATIVE ERROR

Finally, Campbell argues that the admission of the shoes in evidence, the testimony concerning his traffic violations, and the allusion by the prosecutor during closing argument to facts not in evidence—when considered together—constitute more than harmless error and require a reversal. We disagree.

Under the "cumulative error" doctrine, an accumulation of irregularities, each of which in itself might be harmless, may in the aggregate show the absence of a fair trial. *State v. Vallejos,* 86 N.M. 39, 519 P.2d 135, 139 (N.M.Ct.App.1974). The Montana Supreme Court in *State v. McKenzie,* 608 P.2d 428, 448, *cert. denied* 449 U.S. 1050, 101 S.Ct. 626, 66 L.Ed.2d 507 (Mont.1980), observed that the concepts of "harmless error" and "cumulative error" are not interrelated.

"Harmless error" refers to technical errors, which do not require reversal. . . .

"Cumulative error" refers to a number of errors which prejudice defendant's right to a fair trial.

Here we have held that the admission of the shoes in evidence was not error; and that there was no reversible error resulting either from the reference to traffic violations or from the prosecutor's statements during closing argument. With respect to admission of evidence, we have found no errors to "accumulate." We are left with the prosecutor's remarks, and those have been held nonreversible in the preceding section of this opinion.

The judgment of conviction is affirmed.

SWANSTROM and BURNETT, JJ., concur.